UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHANTE WILLIAMS, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:09-cv-1187 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CITY OF HARTFORD, | : | MARCH 31, 2011 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 16)**

**I.   INTRODUCTION**

Shante Williams worked as a dispatcher for the City of Hartford's Emergency Services and Telecommunications Department for approximately 8 years. Williams was terminated on June 9, 2008, ostensibly because she had violated the Department's Workplace Violence Policy by engaging in threatening conduct. Williams filed a grievance through her union and a complaint with Connecticut's Commission on Human Rights and Opportunities, claiming that she was terminated because she is African American. The parties reached a settlement of the grievance in which the Department re-hired Williams and provided compensation reflecting the difference between her salary and the unemployment benefits she had collected. Williams has returned to her position and continues to work for the City.

Williams brought this action pursuant to Title VII in order to collect punitive damages and damages for emotional distress. In a single count Complaint, Williams contends that the Department has applied the Workplace Violence Policy strictly against African American employees, while permitting White and Hispanic employees to engage

1

in similar conduct without similar penalties. In the same count, Williams also alleges that she was passed over for promotion because of her race. The City has moved for summary judgment. For the following reasons, the City's Motion for Summary Judgment is granted in so far as the Title VII claim is based on failure to promote, and denied in so far as the claim is based on Williams' termination.

## II.    BACKGROUND[1]

Plaintiff Shante Williams, an African American woman, began working as a dispatcher for Hartford's Emergency Services and Telecommunications Department on August 31, 2000. Williams testified that beginning in or around August 2006 and continuing into 2007, she made requests to her employer to be considered for the role of acting supervisor. Def. Ex. 2 (Williams Depo.) at 13-14. Williams testified that the role of acting supervisor is not equivalent to that of a regularly scheduled shift supervisor, but instead involves someone in the dispatcher position taking on additional duties. Id. at 15. Williams testified that the benefit of taking on the acting supervisor duties was that doing so would put one in a position to be considered for the position of a permanent supervisor. Id. at 15-16. Williams also testified that dispatchers were sometimes assigned the responsibility of training new employees and that, at least in recent years, they would receive an hour of overtime pay for doing so. Id. at 21-22. In 2007, Williams' supervisors let her know that she would not be assigned to conduct trainings for new employees. Id. at 23-24. In a letter dated March 10, 2008, the

---

[1] Because the parties' submissions consist largely of unsworn witness statements and letters, and because none of the exhibits are supported by an affidavit verifying their accuracy or content, much of the record is hearsay and inadmissible evidence. The following statement of background facts is merely as a summary of relevant portions of the submitted documents, and does not indicate any finding that the matters discussed are backed by competent evidence.

Director of the Emergency Services and Telecommunications Department, Gary Stango, informed Williams that her request to be a trainer had been granted on the condition that she complete a course.  Pl. Ex. 7.

On or about March 10, 2008, Williams provided Director Stango with a written complaint concerning what she perceived as unfair or unprofessional conduct from her supervisors.  See Pl. Ex. 6; Def. Ex. 2 (Williams Depo.) at 51-52.  In a letter dated March 24, 2008, Stango responded to Williams' complaint,  stating, "when presented in your own words, [your complaints] show that no matter how many times you are directed to do something, you continue, in many instances, to ignore or partially comply with the Supervisor's direction."  Pl. Ex. 6.  Stango provided a point-by-point response to 12 of Williams' itemized complaints and claimed that he would "speak to all of my Supervisors to ensure that they strive to maintain a professional demeanor . . . ."  Id.

Williams received this response after her work shift on or about March 26, 2008.  After reading the response, Williams returned to the work floor in order to speak with Sherylene Chapman, a co-worker and union representative.  Def. Ex. 2 at 52.  She testified that she felt that her complaint had been "turned around on [her]" and that the response made "it seem as though I was insubordinate or that my actual complaint wasn't valid."  Id.

The nature and content of the conversation between Williams and Chapman is disputed.  In a police report, Williams' supervisor, Paul Bruce, claimed that Williams, speaking in "a voice slightly louder than conversational tone," told Chapman:  "Now I know why people go off.  I'm not like that.  It's a good thing I don't have a gun now.  I wouldn't want to hurt my co-workers, but they can kiss my butt."  Pl. Ex. 2 at 3.  A co-

3

worker reported that Williams said, "Y'all better be lucky I'm not crazy and I don't own any guns."  Pl. Ex. 3.  Another co-worker stated that Williams said, "[you] should be happy that [I] don't own a gun."  Pl. Ex. 4.  However, that co-worker added, "At no time did I feel threatened by her or her comment."  Id.

In her deposition testimony, Williams denied saying the words, "I'm glad I don't own a gun," Def. Ex. 2 at 54, and "I wouldn't want to hurt my coworkers," id. at 56.  She testified that she did say, "I would never, never hurt any of my coworkers."  Id. at 55.  In her deposition testimony, Williams described the conversation as follows:

> . . . I was speaking about the lack of proactivity in our department; how we're so – we're more so reactive.  We always wait until something happens.  We always wait or usually management always waits until it gets to an extreme standpoint for something to be done.
>
> . . . [T]o the best of my recollection I made a statement in the sense of:  You know what?  If – now, if someone had a gun, everyone would be, you know, speaking about why – why this person did what they did or – I was speaking of:  Now, when people come to work or they have a weapon – or have a gun at work or something, people are always quick to ask – talk about them and say:  Oh, they're crazy; they don't know why they did that.  And no one ever takes the time to find out why the person acted that way or to do things to prevent things like that from happening.
>
> [I was s]peaking to her about that probably for a couple of minutes.  And then after that I think I gathered the rest of my stuff and said by to everybody and I left for the day.

Def. Ex. 2 at 52-53.  All accounts agree that Williams left the workplace shortly after her conversation with Chapman without saying or doing anything else of note.

After overhearing Williams' conversation with Chapman, supervisor Paul Bruce decided to call the police.  See Pl. Ex. 2 (Hartford Police Report).  Bruce claims that he

4

called the police after consulting with Director Stango and after hearing from another employee who was "very concerned for her safety" and "worried about the potential for workplace violence." Pl. Ex. 2 at 3.

Williams was placed on paid administrative leave beginning on or about March 26, 2008. Def. Ex. 2 at 60. On or about May 30, 2008, Williams' employer conducted a pre-disciplinary hearing on the charge that Williams had violated the City of Hartford's Workplace Violence Policy. Pl. Ex. 8 (Report of Hearing and Decision). The City's Workplace Violence Policy prohibits threats of violence in the workplace, which are defined to include "any comment or behavior that would be interpreted by a reasonable person as indicating the potential of physical violence toward people or property." Pl. Ex. 1 (Workplace Violence Policy).

The pre-disciplinary hearing was conducted by Director Stango, with union representatives present. Pl. Ex. 8. Stango found that three witnesses corroborated that Williams had said, "Now I know why people go off. We should all be happy that I don't have a gun now. I wouldn't want to hurt my co-workers." Id. Stango characterized the incident as a "potentially explosive event" and as a violation of the Workplace Violence Policy. Id. Based on the Hearing and a Department investigation, Stango decided to terminate Williams effective June 9, 2008. Id. at 2.

Williams challenged her termination by filing a union grievance, see Pl. Opp. at 1, and a claim with the "Department of Labor,"[2] Def. Ex. 2 at 60. Following arbitration

---

[2] The facts regarding Williams post-termination proceedings, which are undisputed, are based solely on Williams' deposition testimony and attorney argument. See L. Rule 56(a) Statements ¶¶ 15, 16. This testimony does not make clear whether "Department of Labor" refers to a federal or state entity. The parties did not provide any record labeled as a "Department of Labor" claim. The parties have provided unverified records that appear to be related to a claim filed with, and summarily dismissed by, the

proceedings, Williams and the City settled the union grievance. See Pl. Opp. at 1; Def. Ex. 2 at 60-61. As a result of that settlement, Williams was reinstated to her position in January 2009, and Williams received payment for the difference between her unemployment benefits and the wages she would have received during her period of termination. Def. Ex. 2 at 60-61.

### III. LEGAL STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). When determining whether summary judgment is warranted, the court may rely only on admissible evidence. Estate of Hamilton v. City of New York, 627 F.3d 50, 53 (2d Cir. 2010).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy

---

Connecticut Commission on Human Rights and Opportunities. See Def. Exs. 1, 3, & 4. The basis for and the effect of this dismissal are unclear. There is no indication in the record that Williams pursued any relief through the federal Equal Employment Opportunity Commission. Nor does the Complaint allege that she did. Although exhaustion of administrative remedies is a precondition for bringing suit under Title VII, it is not a jurisdictional prerequisite, and a plaintiff's failure to exhaust remedies may be waived. See Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000) (holding that the issue of plaintiff's failure to exhaust EEOC remedies was waived by defendant's failure to raise the issue until after judgment had entered). Because the parties have not briefed this issue, the court does not address it here.

6

that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

"In an employment discrimination case, the plaintiff has the initial burden of 'proving by the preponderance of the evidence a prima facie case of discrimination.'" Carlton, 202 F.3d at 134 (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). "To meet her initial burden of establishing a prima facie case of discrimination, [a plaintiff] must demonstrate that: (1) she is a member of a protected class; (2) she . . . was qualified for a job . . .; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination." Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 (2d Cir. 2004). "[A] plaintiff's burden of establishing a prima facie case is de minimus . . . ." Id. (quotations and citations omitted).

"If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises. The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for discharging the employee." Carlton, 202 F.3d at 134 (quotations and citations omitted). If the employer does so, "the presumption of discrimination raised by the prima facie case simply drops out of the picture. At this stage, the burden shifts back to the plaintiff to offer proof . . . that would allow a rational factfinder to conclude that the proffered reason was not the true reason

for the adverse employment action, and that [a discriminatory reason] was." Id. at 134-35 (citations and quotations omitted).

IV. **DISCUSSION**

   A. **Termination Claim**

The first three elements of plaintiff's prima facie case are not disputed. Williams is African-American. She held her position with EST from August 31, 2000 to June 9, 2008, and she has since been reinstated to that position since January 2009. However, she was terminated effective June 9, 2008. Therefore, she is a member of a protected class; she is qualified for her job; and she did suffer an adverse employment action.[3]

In this case, the fourth element of the prima facie case—circumstances permitting an inference of discrimination—is difficult to separate from the next step of the burden-shifting analysis. The City's alleged non-discriminatory reason for the termination—that Williams violated the Workplace Violence Policy—provides the basis for Williams' argument that the circumstances of her termination support an inference of discrimination. Williams claims that she did not, in fact, violate the Workplace Violence Policy and that the Policy is applied more strictly to African-American employees than to employees of other races. Thus, the parties dispute both whether Williams can carry her initial burden of establishing circumstances that support an inference of discrimination and whether the City can provide a legitimate, non-discriminatory reason for Williams' termination. There are material questions of fact which prevent the court

---

[3] The City did not argue that this finding of an adverse employment action is undercut by the fact that Williams was reinstated and paid the equivalent of her lost wages. Williams claims, and the City did not dispute, that the parties' settlement did not bar a legal action to recover damages for emotional distress or punitive damages. See Williams L. Rule 56(a)(2) Statement ¶ 16.

8

from resolving these disputed issues as a matter of law.

There is significant disagreement about what Williams said and how she said it. Specifically, Williams testified that she did not say a number of the things that she was accused of saying, including, "I'm glad that I don't own a gun," Def. Ex. 2 at 54, and, "I wouldn't want to hurt my coworkers," id. at 56. Instead, Williams testified that she said, "I would never hurt my coworkers." Id. at 56. On the City's Motion for Summary Judgment against Williams, the court credits Williams' testimony.

Furthermore, although Williams' full account of her comments is not entirely clear, a jury could reasonably conclude that Williams' comments were not part of an angry or threatening tirade, but part of non-threatening and appropriate conversation between two co-workers. See id. at 52-53. Williams' deposition testimony could fairly be taken to indicate that she and Chapman were having a reasonable discussion about whether management was sensitive to, and "proactive" about, employee concerns, and that Williams simply illustrated that management's failure to be proactive could, in a hypothetical, worst case scenario, lead to workplace violence. See id.

The other, conflicting accounts of Williams' comments are largely hearsay statements drawn from police reports, e.g., Pl. Exs. 2-4, and from Director Stango's report of the disciplinary hearing, Pl. Ex. 8. They may not be relied on when deciding a motion for summary judgment, Estate of Hamilton, 627 F.3d at 53 (the court "may rely only on admissible evidence"). Even if submitted in an admissible form, they would not permit the court to resolve this disputed issue of fact on summary judgment.[4]

---

[4] If considered, at least one of the hearsay statements would tend to support Williams' argument that her statements were not reasonably construed to be threatening. One co-worker is reported as saying that he did not feel threatened by her or her comment. Pl. Ex. 4 (Statement of Stephen Fisher).

The dispute regarding what Williams said, and how she said it, is material. The Workplace Violence policy calls for a "work environment free from the threat of violence," and it defines "threat of violence" to mean "any comment or behavior that would be interpreted by a reasonable person as indicating the potential of physical violence toward people or property." Pl. Ex. 1. Whether or not the City has presented a legitimate, non-discriminatory reason for Williams' termination depends on whether or not it was reasonable for Director Stango to construe Williams' comments as violating this policy. If the jury determines that her comments were, in their content and manner, non-threatening, then the jury may conclude that the City's alleged rationale is not credible. The conclusion that the City's rationale is not credible could, in turn, provide some support for an inference that Williams' termination was actually motivated by race. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").

There is also a disputed issue of fact about whether Williams' employer has enforced the Workplace Violence Policy in a manner that is biased against African-American employees. Williams has provided admissible evidence of at least two cases in which arguably threatening statements, uttered by non-African-American employees, did not result in any discipline.[5] First, in her deposition Williams testified that Supervisor Paul Bruce, a Caucasian male, "said something along the lines of: 'Well,

---

[5] Some of the other evidence of disparate enforcement, e.g., the handwritten complaint signed by Kim Walton, Pl. Ex. 9, is hearsay and cannot be relied upon in assessing whether summary judgment is warranted.

why don't I just blow my F-ing brains out,' something of that sort." Pl. Ex. 11 at 33. Williams later admitted that she did not actually hear this particular statement; she heard about it from Sherylene Chapman. Id. at 39. However, Williams testified that she personally heard Bruce "make a similar statement without the F word before." Id. Second, in an Affidavit, Williams claims that she saw and heard Lisa Baez—an employee who is described as "not African-American"—say something similar. Pl. Ex. 13 ¶ 3. According to Williams, Baez became agitated during a difficult telephone call, and after hanging up, Baez yelled, "These fucking people . . . why don't I blow my fucking brains out." Pl. Ex. 13 ¶¶ 5, 6. Williams claims that this occurred within earshot of Supervisor Bruce, id. ¶ 7, and that she is not aware that any disciplinary action was taken against Baez, id. ¶ 8.

The statements uttered by Baez and Bruce can both technically be interpreted as violating the Workplace Violence Policy. As written, the Policy contains no exception for statements indicating a likelihood of self-directed violence. Nor is it clear why graphic threats of self-directed violence in the workplace should be tolerated as something that is not covered by the Workplace Violence Policy. Instead, whether or not the statements of Bruce and Baez should have been treated as threats in violation of the Policy presumably depends, at least in part, on the manner in which they were said, and that is a question for the jury.

Whether or not the failure to enforce the Workplace Violence Policy against Bruce and Baez supports an inference of discrimination depends, at least in part, on how comparable their comments were to the comments made by Williams. If the jury finds that Bruce's or Baez's comments were, in fact, fairly threatening and that Williams'

11

comments were not threatening, this would support an inference that the Workplace Violence Policy is enforced more strictly against African-American employees and that Williams' termination was motivated by race.

In sum, Williams' Title VII claim with respect to her termination depends on disputed issues of fact concerning what she said and the manner in which she said it, as well as a disputed issue of fact as to why the Workplace Violence Policy was not enforced in other cases involving non-black employees. If these issues of fact were resolved in Williams' favor, a jury could reasonably conclude that Williams' termination was an instance of unlawful employment discrimination. Therefore, the City of Hartford's Motion for Summary Judgment is denied with respect to the Title VII claim based on Williams' termination.

### B. Promotion Claim

The Complaint also contains an allegation that Williams was passed over for promotion based on her race. Complaint ¶ 10. The City argues that this specific allegation was not raised in any administrative proceedings and that, in her deposition, Williams failed to identify any promotion opportunity that had been denied to her. Williams' deposition testimony indicates that she unsuccessfully sought the role of acting supervisor, but her deposition testimony does not clearly indicate whether that role would be considered a promotion. See Def. Ex. 2 at 13-16. Williams admitted that the role of acting supervisor is performed by someone in Williams' dispatcher position and that the benefit of the role was a likelihood of increased consideration if and when an opportunity for promotion arose. Id. at 15-16.

In her Opposition, Williams did not mention, much less address, the City's

arguments for summary judgment on the allegation that Williams was passed over for promotion on the basis of race. Williams did not submit any evidence or argument that the failure to promote claim was raised in any administrative proceedings or that denial of the acting supervisor role was an adverse employment action. Williams also did not provide any evidence that race played a role in the decisions to assign the role of acting supervisor. Her testimony indicates at least two other African-American employees, Sherylene Chapman and Kim Walton, performed the responsibilities of acting supervisor. Def. Ex. 2 at 20.

Due to the absence of argument in her Opposition, it appears that Williams has abandoned this allegation as a basis for her Title VII claim. The court concludes that Williams has failed to show that there is an issue of material fact as to the allegation that she was passed over for promotion on the basis of race. Therefore, the City's Motion is granted to the extent that Williams' Title VII claim is based on a failure to promote.

## V. CONCLUSION

For the foregoing reasons, the City of Hartford's Motion for Summary Judgment (Doc. No. 16) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is granted in so far as Williams' Complaint is based upon the City's failure to promote her, but denied in so far as it is based upon Williams' termination.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 31st day of March, 2011.

                                        /s/ Janet C. Hall
                                        Janet C. Hall
                                        United States District Judge